# IN RE CANDACE H.*
## (AC 20663)

Landau, Mihalakos and Daly, Js.

Argued January 25—officially released May 22, 2001

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

*Carolyn C. Mihalek,* for the appellant (respondent mother).

*John E. Tucker,* assistant attorney general, with whom, on the brief, were *Richard Blumenthal,* attorney general, and *Benjamin Zivyon,* assistant attorney general, for the appellee (petitioner).

*Sharon Wicks Dornfeld,* for the appellees (intervenors).

*Opinion*

MIHALAKOS, J. The respondent mother[1] appeals from the judgment of the trial court denying her motion for visitation with her minor child. On appeal, the respondent claims that the court (1) abused its discretion in denying her motion for visitation and (2) impermissibly delegated to the department of children and families (department) and to the child's paternal aunt and uncle the responsibility of determining, in the future, whether visitation by the respondent is in the child's best interest. We conclude that the court properly denied the respondent's motion for visitation, but impermissibly delegated to the department and to the aunt and uncle its independent obligation to determine and further the child's best interest.

The following facts and procedural history are relevant to the disposition of this appeal. On May 29, 1998, the respondent gave birth to a daughter. Shortly thereafter, the respondent voluntarily placed the child in a foster home associated with Lutheran Social Services of New England (social services agency), a private, nonprofit social service agency. She asked the social services agency to assist her in placing the child up for adoption.

---

[1] Only the respondent mother is involved in this appeal. We refer in this opinion to her as the respondent.

On June 12, 1998, the respondent informed the social services agency that she no longer wanted to put the child up for adoption. Three days later, however, the respondent reconsidered, and the social services agency continued to provide a foster home for the child. She later reconsidered again. On July 16, 1998, the respondent took the child home.

Only eight days later, on July 24, 1998, the respondent became overwhelmed by the responsibility of caring for the child and voluntarily placed her in the care of the department. As the end of the period of voluntary placement was nearing, the commissioner of children and families (commissioner) applied for an order of temporary custody pursuant to General Statutes (Rev. to 1997) § 46b-129 (a)[2] and Practice Book § 32-6 (a).[3]

[2] General Statutes (Rev. to 1997) § 46b-129 (a) provides: "Any selectman, town manager, or town, city, or borough welfare department, any probation officer, the Connecticut Humane Society, or the Commissioner of Social Services, the Commissioner of Children and Families or any child-caring institution or agency approved by the Commissioner of Children and Families, a child or his representative or attorney or a foster parent of a child, having information that a child or youth is neglected, uncared-for or dependent, may file with the Superior Court which has venue over such matter a verified petition plainly stating such facts as bring the child or youth within the jurisdiction of the court as neglected, uncared-for, or dependent, within the meaning of section 46b-120, the name, date of birth, sex, and residence of the child or youth, the name and residence of his parents or guardian, and praying for appropriate action by the court in conformity with the provisions of this chapter. Upon the filing of such a petition, except as otherwise provided in subsection (e) of section 17a-112, the court shall cause a summons to be issued requiring the parent or parents or the guardian of the child or youth to appear in court at the time and place named, which summons shall be served not less than fourteen days before the date of the hearing in the manner prescribed by section 46b-128, and said court shall further give notice to the petitioner and to the Commissioner of Children and Families of the time and place when the petition is to be heard not less than fourteen days prior to the hearing in question."

[3] Practice Book § 32-6 (a) provides: "Upon proper application therefor, an order of temporary custody may be issued ex parte by the judicial authority at the time of the filing of the petition or subsequent thereto. The application must be supported by a sworn statement alleging such facts as would support a finding of probable cause to believe that the child is suffering from serious physical illness or serious physical injury or is in immediate

On November 24, 1998, the court granted the commissioner's application. The trial court renewed the order of temporary custody on December 3, 1998.

On February 10, 1999, a paternity test revealed that the respondent's ex-husband was the child's father. On February 22, 1999, the department placed the child in the care of her paternal aunt and uncle. On December 1, 1999, the commissioner moved for review of its permanency plan for the child pursuant to General Statutes § 46b-129 (k) (1).[4] As articulated in its motion, the commissioner intended to petition for the termination of parental rights with respect to the child to allow the child's paternal aunt and uncle to adopt her.

On January 24, 2000, pursuant to an agreement among the respondent, the father, and the aunt and uncle, the court adjudicated the child a neglected child and committed her to the custody of the commissioner for twelve months, as permitted by General Statutes (Rev. to 1997) § 46b-129 (d).[5] Ten days later, on February 3,

physical danger from the surroundings and that immediate removal from such surroundings is necessary to ensure the child's safety."

[4] General Statutes § 46b-129 (k) (1) provides: "Ten months after the adjudication of neglect of the child or youth or twelve months after the vesting of temporary care and custody pursuant to subsection (b) of this section, whichever is earlier, the commissioner shall file a motion for review of a permanency plan and to extend or revoke the commitment. Ten months after a permanency plan has been approved by the court pursuant to this subsection, unless the court has approved placement in long-term foster care with an identified person or an independent living program, or the commissioner has filed a petition for termination of parental rights or motion to transfer guardianship, the commissioner shall file a motion for review of the permanency plan to extend or revoke the commitment. A hearing on any such motion shall be held within sixty days of the filing. The court shall provide notice to the child or youth, and his parent or guardian of the time and place of the court hearing on any such motion not less than fourteen days prior to such hearing."

[5] General Statutes (Rev. to 1997) § 46b-129 (d) provides in relevant part: "Upon finding and adjudging that any child or youth is uncared-for, neglected or dependent, the court may commit him to the Commissioner of Children and Families for a maximum period of twelve months, unless such period is extended in accordance with the provisions of subsection (e) of this

2000, the respondent filed a motion for an order of visitation pursuant to General Statutes § 46b-59[6] and Practice Book (2000) § 25-4.[7]

On February 10, 2000, at the conclusion of a two day hearing, the court approved the commissioner's permanency plan and denied the respondent's motion for visitation. On March 30, 2000, the respondent appealed, challenging the court's approval of the permanency plan and its denial of her motion for visitation.

section, provided such commitment or any extension thereof may be revoked or parental rights terminated at any time by the court, or the court may vest such child's or youth's care and personal custody in any private or public agency which is permitted by law to care for neglected, uncared-for or dependent children or youth or with any person or persons found to be suitable and worthy of such responsibility by the court. . . ."

[6] General Statutes § 46b-59 provides: "The Superior Court may grant the right of visitation with respect to any minor child or children to any person, upon an application of such person. Such order shall be according to the court's best judgment upon the facts of the case and subject to such conditions and limitations as it deems equitable, provided the grant of such visitation rights shall not be contingent upon any order of financial support by the court. In making, modifying or terminating such an order, the court shall be guided by the best interest of the child, giving consideration to the wishes of such child if he is of sufficient age and capable of forming an intelligent opinion. Visitation rights granted in accordance with this section shall not be deemed to have created parental rights in the person or persons to whom such visitation rights are granted. The grant of such visitation rights shall not prevent any court of competent jurisdiction from thereafter acting upon the custody of such child, the parental rights with respect to such child or the adoption of such child and any such court may include in its decree an order terminating such visitation rights."

[7] Practice Book (2000) § 25-4 provides: "Every application in an action for visitation of a minor child, other than actions for dissolution of marriage, legal separation or annulment, shall state the name and date of birth of such minor child or children, the names of the parents and legal guardian of such minor child or children, and the facts necessary to give the court jurisdiction. The application shall comply with Section 25-5. Such application shall be commenced by an order to show cause. Upon presentation of the application, the judicial authority shall cause an order to be issued requiring the adverse party or parties to appear on a day certain and show cause, if any there be, why the relief requested in the application should not be granted. The application and order shall be served on the adverse party not less than twelve days before the date of the hearing, which shall not be held more than thirty days from the filing of the application."

On June 2, 2000, the commissioner filed a motion to dismiss the appeal for, inter alia, the lack of a final judgment.[8] On July 13, 2000, this court concluded that the approval of a permanency plan was not a final judgment and, accordingly, granted the motion to dismiss the appeal as to the respondent's challenge to the permanency plan that the trial court had approved for the child. This court denied, however, the motion to dismiss the challenge to the visitation order, concluding that a visitation order entered in the course of a termination proceeding was a final judgment for the purposes of appellate review. Additional facts and procedural history will be set forth as necessary.

I

The respondent first claims that the court abused its discretion in denying her motion for visitation. We disagree.

The guiding principle in determining whether visitation is proper is the best interest of the child. "In making or modifying any order with respect to custody or visitation, the court shall . . . be guided by the best interests of the child . . . ." General Statutes § 46b-56 (b) (1).[9] "The best interests of the child include the child's interests in sustained growth, development, well-being, and

---

[8] "With the exception of certain statutory rights of appeal that are not relevant here, appellate jurisdiction is limited to appeals from final judgments." *Madigan* v. *Madigan*, 224 Conn. 749, 752, 620 A.2d 1276 (1993), citing General Statutes §§ 51-197a, 51-199 and 52-263; Practice Book § 4000, now § 61-1.

[9] General Statutes § 46b-56 (b) provides: "In making or modifying any order with respect to custody or visitation, the court shall (1) be guided by the best interests of the child, giving consideration to the wishes of the child if the child is of sufficient age and capable of forming an intelligent preference, provided in making the initial order the court may take into consideration the causes for dissolution of the marriage or legal separation if such causes are relevant in a determination of the best interests of the child, and (2) consider whether the party satisfactorily completed participation in a parenting education program established pursuant to section 46b-69b."

continuity and stability of its environment. . . . The trial court is vested with broad discretion in determining what is in the child's best interests." (Citation omitted.) *Schult* v. *Schult*, 241 Conn. 767, 777, 699 A.2d 134 (1997). "In determining whether there has been an abuse of discretion, the ultimate issue is whether the court could reasonably conclude as it did. . . . Accordingly, it is only in rare instances that the trial court's decision will be disturbed." (Citation omitted; internal quotation marks omitted.) *Simmons* v. *Simmons*, 244 Conn. 158, 175, 708 A.2d 949 (1998). With this standard in mind, we turn to the respondent's claim.

The following additional facts and procedural history are relevant to our disposition of this claim. The court requested that Carol Swenson, a psychologist, evaluate the respondent's level of psychological functioning and her capacity to care for and interact with the child. The court also requested that Swenson conduct a similar evaluation of the father, and evaluate the nature of the relationship between the child and her potential adult caregivers, her aunt and uncle. On July 8, 1999, Swenson interviewed and evaluated the respondent, and, on July 6, 1999, she interviewed and evaluated the father. Swenson also observed the child interact with her aunt and uncle.

On August 16, 1999, the court received a written report from Swenson, which included the results of her evaluations of the respondent[10] and the

---

[10] Regarding the respondent, Swenson's report states in relevant part: "She has been diagnosed with Schizoid Personality Disorder and takes the antidepressant Zoloft. . . . She related that she began having psychological problems in high school and saw a psychologist at that time.

\* \* \*

"[The respondent] may well have difficulty with impulse control, with her ego being poorly developed, the results being that she may often act in a manner that has been inadequately thought out. It is likely that she exhibits poor judgment because of this and that she may experience much self-doubt and lack of confidence. There are indications that she has hostile and oppositional tendencies that she attempts to repress. However, these aggressive feelings, coupled with her poor ability to understand herself and

father.[11] In her report, Swenson stated: "It is my recommendation that [the respondent's] and [the father's] parental rights be terminated and that [the aunt and uncle] adopt [the child]. It is recommended that this be an open adoption but that [the child's] contact with [the respondent] be quite limited during the early years as [the respondent's] behavior is odd and inconsistently appropriate and could easily be distressing and confusing for a young child. Visits, when they occur, should always be supervised and of limited duration. . . . If the visits of either of the biological parents [become] a source of distress or concern to [the child] or the [aunt and uncle], it is recommended that visits cease until she is old enough to have a clear understanding of the limitations of her biological mother."

During the hearing on the motion for visitation, Swenson testified consistently with her report, which the court admitted into evidence. Carolyn Powell, a marriage and family therapy intern at Southern Connecticut

to control and modulate her actions can lead to inappropriate, at times, bizarre behavior. . . . Her drawings suggest schizoid personality qualities, consistent with her diagnosis.

\* \* \*

"[The respondent's] psychological problems are significant, interfering with judgment, her interpersonal relationships, her ability to tolerate stress and to understand complex situations. If stress and expectations for productive action are kept to a minimum and if her life is kept rather narrowly contained, it is more likely that she will be able to function within those confines. Novel situations and unexpected demands are likely to create much stress for her, and her reaction can become irrational."

[11] Regarding the father, Swenson's report provides in relevant part: "He perceives himself as gregarious and enjoys attention. Interpersonally, he may, however, be somewhat intolerant and insensitive. If [the father] were seeking custody of [the child], further personality testing would be recommended. However, for the purposes of this evaluation, I believe we are safe to assume that he has no other primary psychological problem than alcoholism and the cluster of defense mechanisms and personality dysfunction associated with that disorder—specifically, poor insight, limited ability to tolerate frustration, avoidance of difficult situations, low self-esteem and poor organization of his life."

State University, and Joseph Ovide, a social worker employed at the department, also testified at the hearing. Powell testified that she had facilitated and supervised two visits between the respondent and the child. She testified that the visits occurred on January 13 and 27, 2000. Regarding the first visit, Powell testified as follows: "We brought [the child] in the room with the [respondent] and she continued to cry. Every effort the [respondent] attempted to soothe and pacify her was not successful; she cried the whole time. At which point, after about twenty-five minutes, I said we had to cancel the visit because the child would not calm down."

Regarding the second visit, Powell testified as follows: "When the [respondent] came, I asked the [uncle] . . . to leave the room so the [respondent] can have the interaction with the child. And [the child] attempted to follow [the uncle] out of the room. . . . [The child] started crying and chasing after [the uncle] and she kept crying the whole time we tried to keep her in the room. She would just not calm down, even after the [respondent] attempted to calm her. . . .

"[The respondent] picked [the child] up. [The respondent] held her close. She patted [the child] on the back and walked around the room with her, and [the child] still kept screaming and pointing towards the door. . . . I decided that the time was up for—she was crying so hard that I decided it was uncomfortable for her and we should end the visit. At that point, my supervisor came in the room and said she heard the child crying down the hallway. And [the uncle] had also heard the child crying and said we should end the visit. So, the visit was ended."

Ovide testified that he was a case manager for the department and that he had supervised visits between the respondent and the child. Regarding the visits, he testified as follows: "[The respondent] was a bit with-

drawn from the child at times. The child would need to venture forth and play with the toys and that would annoy—well, that would seem to bother the [respondent] at times. She would try to get the child's attention, but, at that point, the child would either cry or just resist tremendously and tend to gravitate towards the person she knew most, which was me. So, there really wasn't a connection at times." Ovide also testified that "[the respondent] would consistently call and cancel visits because she wasn't comfortable with the situation or the people around the child."

At the conclusion of the hearing, the court found that (1) the respondent had not been consistent in maintaining visitation with the child, (2) the visits that had taken place had not gone well, (3) the child had become attached to her aunt and uncle, (4) the respondent had not related naturally or interacted appropriately with the child and (5) the respondent's visits had been upsetting to the child. On the basis of these findings, the court concluded that visitation by the respondent was not in the child's best interest.

We have reviewed the record, including the evidence previously discussed, and we conclude that the court's factual findings are reasonable and that the court reasonably concluded that continued visitation was not in the child's best interest. Accordingly, we conclude that the court did not abuse its broad discretion in declining to order visitation.

II

The respondent also claims that the court impermissibly delegated to the department and to the aunt and uncle the responsibility of determining, in the future, whether visitation by the respondent is in the best interest of the child. We agree.[12]

---

[12] Additionally, the respondent claims that the department and the aunt and uncle "are biased against her and that if visitation is left up to them without a court order no visitation will ever take place." Because we con-

The following additional facts are relevant to our disposition of this claim. On February 10, 2000, the court rendered an oral decision denying the respondent's motion for visitation. In so doing, the court stated in relevant part: "[C]ourt-ordered visitation with the [respondent] does not make much sense to me. . . . As for the [respondent], she has not been consistent in maintaining visitation. The visits that have taken place have not gone particularly well, perhaps because [the child] is so young and has become attached to her [aunt and uncle], or perhaps because the [respondent] [did] not relate that naturally or interact appropriately with [the child]. The visits are in fact quite upsetting to [the child].

"I therefore find that court-ordered visitation is not in [the child's] best interest. Based on that, I deny the [respondent's] motion for visitation and decline to order any visitation. This order, of course, or absence of an order, does not mean that visitation may not take place or should not take place. [*The department*] *may decide to permit it if it concludes that it is in* [*the child's*] *best interest.* . . .

"In short, I trust and believe that [the aunt and uncle], who have demonstrated their ability to care for [the child], will use discretion and will take an enlightened approach in deciding this issue. *I therefore leave it to them and* [*the department*] *to decide.*" (Emphasis added.)

As stated in part I of this opinion, "[t]he standard for reviewing a visitation order is whether the trial court abused its discretion in making that order." *Gallo* v. *Gallo*, 184 Conn. 36, 43, 440 A.2d 782 (1981). "In exercising that discretion the court considers the rights and wishes of the parents and may hear the recommenda-

clude that the court impermissibly delegated its responsibility to the department and to the aunt and uncle, we do not address this claim.

tions of professionals in the family relations field, but the court must ultimately be controlled by the welfare of the particular child." Id. Furthermore, the court has an "independent obligation for the welfare of the children before it, an obligation that has deep roots in our jurisprudence." *Newman* v. *Newman*, 235 Conn. 82, 98, 663 A.2d 980 (1995). In the present case, the court's order empowered the department and the aunt and uncle to determine, in the future, whether the child's best interest would be served by permitting the respondent to visit her. In so doing, the court impermissibly delegated its "independent obligation" to determine and further the child's best interest. See id.; cf. *Weinstein* v. *Weinstein*, 18 Conn. App. 622, 629, 561 A.2d 443 (1989) (orders empowering counsel for minor children to select evening when plaintiff could see children for dinner was improper delegation of judicial function). Accordingly, we conclude that the trial court abused its legal discretion. See *Simmons* v. *Simmons*, supra, 244 Conn. 175.

The judgment is affirmed as to the denial of the respondent's motion for visitation. The judgment is reversed as to the order empowering the department and the aunt and uncle to determine, in the future, whether visits by the respondent are in the child's best interest, and the case is remanded with direction to vacate that order.

In this opinion the other judges concurred.